UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE NEW YORK TIMES COMPANY and
NEIL BEDI,

                         Plaintiffs,

              v.                                    No. 25-cv-2333-DLC

UNITED STATES DEFENSE
COUNTERINTELLIGENCE AND SECURITY
AGENCY,

                         Defendant.

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dana R. Green
Alexandra Settelmayer
Timothy Tai
The New York Times Company
Legal Department
620 8th Avenue
New York, NY 10018
Phone: (212) 556-5290
Fax: (212) 556-4634
dana.green@nytimes.com
alexandra.settelmayer@nytimes.com
timothy.tai@nytimes.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 2

    I.   ELON MUSK ............................................................................................................. 2

        A.   *SpaceX* ....................................................................................................... 2

        B.   *Starlink* ...................................................................................................... 3

        C.   *Government Service* ................................................................................... 6

    II.   MUSK'S SECURITY CLEARANCE .......................................................................... 7

    III.   MUSK'S DRUG USE AND FOREIGN CONTACTS ................................................. 8

        A.   *Musk's Drug Use* ...................................................................................... 8

        B.   *Musk's Foreign Contacts* ...................................................................... 11

    IV.   REVIEWS OF MUSK'S CLEARANCES ................................................................. 12

    V.   THE FOIA REQUEST ............................................................................................. 13

LEGAL STANDARD .............................................................................................................. 14

ARGUMENT .......................................................................................................................... 15

    I.   THE GOVERNMENT IMPROPERLY CONFINES ANALYSIS OF THE
        EXEMPTIONS TO SEPTEMBER 2024 ................................................................... 15

    II.   EXEMPTION 7(C) DOES NOT APPLY BECAUSE THE RECORD WAS
        NOT COMPILED FOR A LAW ENFORCEMENT PURPOSE................................. 16

    III.   THERE IS A SUBSTANTIAL PUBLIC INTEREST IN THE RECORD ................. 18

    IV.   ANY PRIVACY INTEREST IN THE RECORD IS MINIMAL ............................... 22

CONCLUSION ........................................................................................................................ 29

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACLU Immigrants' Rts. Project v. U.S. Immigr. & Customs Enf't*,
    58 F.4th 643 (2d Cir. 2023) ...................................................................................14

*ACLU v. FBI*,
    59 F. Supp. 3d 584 (S.D.N.Y. 2014) ....................................................................27

*Am. Fed'n of Gov't Emps., Local 1760 v. Fed. Lab. Rels. Auth.*,
    786 F.2d 554 (2d Cir. 1986).................................................................................23

*Bartko v. DOJ*,
    898 F.3d 51 (D.C. Cir. 2018)...............................................................................17

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*,
    601 F.3d 143 (2d Cir. 2010)...........................................................................14, 22

*Brennan Ctr. for Just. v. Dep't of Homeland Sec.*,
    331 F. Supp. 3d 74 (S.D.N.Y. 2018) ...............................................................16, 17

*Citizens for Resp. & Ethics in Wash. v. U.S. Postal Serv.*,
    557 F. Supp. 3d 145 (D.D.C. 2021) .................................................................25, 26

*Colo. Wild Pub. Lands v. U.S. Forest Serv.*,
    691 F. Supp 3d 149 (D.D.C. 2023) .......................................................................27

*Ctr. for Pub. Integrity v. DOD*,
    No. 19-cv-3265, 2020 U.S. Dist. LEXIS 140591 (D.D.C. Aug. 6, 2020) ..............26

*Dep't of the Navy v. Egan*,
    484 U.S. 518 (1988).......................................................................................23, 25

*Dep't of State v. Ray*,
    502 U.S. 164 (1991).......................................................................................23, 27

*DOD v. Fed. Lab. Rels. Auth.*,
    510 U.S. 487 (1994)..............................................................................................19

*Ecological Rts. Found. v. EPA*,
    541 F. Supp. 3d 34 (D.D.C. 2021) .......................................................................27

*Fams. for Freedom v. U.S. Customs & Border Prot.*,
    797 F. Supp. 2d 375 (S.D.N.Y. 2011) ..................................................................17

*Florez v. CIA*,
    829 F.3d 178 (2d Cir. 2016)..................................................................................14, 15, 16

*Jamil v. Sec'y, DOD*,
    910 F.2d 1203 (4th Cir. 1990) ......................................................................................23, 24

*Jefferson v. DOJ*,
    284 F.3d 172 (D.C. Cir. 2002)......................................................................................17, 18

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989).............................................................................................................16

*Kendrick v. FBI*,
    No. 20-cv-2900, 2022 U.S. Dist. LEXIS 175454 (D.D.C. Sep. 28, 2022) ............................28

*Knight First Amend. Inst. v. Ctrs. for Disease Control*,
    560 F. Supp. 3d 810 (S.D.N.Y. 2021) ...................................................................................14

*Lardner v. DOJ*,
    638 F. Supp. 2d 14 (D.D.C. 2009) .........................................................................................25

*Leopold v. DOJ*,
    94 F.4th 33 (D.C. Cir. 2024)....................................................................................................28

*Milner v. Dep't of the Navy*,
    562 U.S. 562 (2011).................................................................................................................18

*Mittleman v. Off. of Pers. Mgmt.*,
    76 F.3d 1240 (D.C. Cir. 1996)..................................................................................................17

*Molerio v. FBI*,
    749 F.2d 815 (D.C. Cir. 1984)..................................................................................................26

*Morley v. CIA*,
    508 F.3d 1108 (D.C. Cir. 2007).........................................................................................17, 19

*Multi AG Media LLC v. Dep't of Agric.*,
    515 F.3d 1224 (D.C. Cir. 2008)................................................................................................23

*N.Y. Times Co. v. Dep't of Homeland Sec.*,
    959 F. Supp. 2d 449 (S.D.N.Y. 2013) .....................................................................................25

*N.Y. Times Co. v. DOJ*,
    390 F. Supp. 3d 499 (S.D.N.Y. 2019) .....................................................................................18

*N.Y. Times Co. v. DOJ*,
    756 F.3d 100 (2d Cir. 2014).............................................................................................15, 16

*Nat'l Council of La Raza v. DOJ*,
    411 F.3d 350 (2d Cir. 2005)..................................................................................14

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*,
    486 F. Supp. 3d 669 (S.D.N.Y. 2020) ...................................................................14

*Neuman v. United States*,
    70 F. Supp. 3d 416 (D.D.C. 2014)..........................................................................26

*News-Press v. Dep't of Homeland Sec.*,
    489 F.3d 1173 (11th Cir. 2007) ..............................................................................23

*Perlman v. DOJ*,
    312 F.3d 100 (2d Cir. 2002)..............................................................................19, 20

*Peter B. v. CIA*,
    620 F. Supp. 2d 58 (D.D.C. 2009) ..........................................................................23

*Reporters Comm. for Freedom of the Press v. FBI*,
    3 F.4th 350 (D.C. Cir. 2021) ............................................................................27, 28

*Seife v. FDA*,
    43 F.4th 231 (2d Cir. 2022) ..............................................................................27, 28

*Staehr v. Hartford Fin. Servs. Grp.*,
    547 F.3d 406 (2d Cir. 2008)......................................................................................2

*Stehney v. Perry*,
    907 F. Supp. 806 (D.N.J. 1995) ..............................................................................23

*Stein v. CIA*,
    No. 17-cv-189, 2024 U.S. Dist. LEXIS 174014 (D.D.C. Sept. 26, 2024)...............27

*Stern v. FBI*,
    737 F.2d 84 (D.C. Cir. 1984) ..................................................................................21

*United Am. Fin., Inc. v. Potter*,
    531 F. Supp. 2d 29 (D.D.C. 2008) ..........................................................................23

*Wash. Post Co. v. Dep't of Health & Hum. Servs.*,
    690 F.2d 252 (D.C. Cir. 1982) ................................................................................19

*Wells Fargo Bank v. Wrights Mill Holdings*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015) ......................................................................2

*WP Co. v. Department of Defense*,
    626 F. Supp. 3d 69 (D.D.C. 2022) ..........................................................................24

**Statutes & Other Authorities**

32 C.F.R. § 147.10 .................................................................................................................8

5 U.S.C. § 552 ................................................................................................................ *passim*

Plaintiffs The New York Times Company and Neil Bedi (together, "The Times") respectfully submit this memorandum of law in support of their cross-motion for summary judgment and in opposition to the motion for summary judgment of Defendant the United States Defense Counterintelligence and Security Agency (the "Government" or "DCSA").

## PRELIMINARY STATEMENT

This case concerns a straightforward Freedom of Information Act ("FOIA") request (the "Request"): The Times seeks a list of the security clearances granted to Elon Musk. Musk is, of course, one of the most powerful and influential people in the world. When The Times filed its Request, he was a civilian who controlled technology and infrastructure critical to national security. By the time The Times exhausted its administrative remedies, he was an adviser to the President and led a government agency with unprecedented power to reshape the federal government. In both roles, he had access to highly sensitive national security information. Questions repeatedly have been raised regarding the scope of his security clearances, whether he is qualified to hold them, and whether DCSA appropriately and rigorously exercised oversight of his clearances. These are matters of obvious public interest.

The Government nevertheless denied the Request, claiming it would cause an unwarranted invasion of Musk's personal privacy to provide the document. The Government maintains this position, despite Musk publicly discussing his security clearances, despite the limited scope of the Request, and despite the overwhelming public interest in that information. The Government's position is untenable, and the Court should order disclosure.

## FACTUAL BACKGROUND[1]

### I.    ELON MUSK

Whether as a civilian or government official, Musk exercises significant influence on national security and government affairs in the United States and abroad, including through his control of the companies SpaceX and Starlink.

#### A.  *SpaceX*

SpaceX is a privately held company that Musk founded and controls.[2] Concerns repeatedly have been raised, including by members of Congress, about the federal government's dependence on SpaceX technology and services.[3] The company dominates the market for space launches; last year SpaceX launched more than 80% of all spacecraft worldwide.[4] SpaceX controls the only American vehicle capable of taking astronauts to the International Space Station; SpaceX is an essential contractor to the Pentagon's planned "Golden Dome" missile defense program; and SpaceX has contracts to launch many of NASA's most important missions, including to journey to the moon.[5] In 2024, SpaceX was awarded a $1.8 billion classified contract with the National Reconnaissance Office; SpaceX-built equipment reportedly is integrated directly into spy agencies and military networks that defend the United States against missile attacks and allow the military to monitor enemy forces.[6] Overall, the federal government has awarded nearly $18 billion in

---

[1] The Court may properly take judicial notice of press reports, public websites, and other public statements for the fact of their existence, without regard to the truth of their contents. *See Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008); *Wells Fargo Bank v. Wrights Mill Holdings*, 127 F. Supp. 3d 156, 166–67 (S.D.N.Y. 2015).

[2] *Profile: Elon Musk*, FORBES, http://bit.ly/3TGFFkq.

[3] *See, e.g.*, Eric Lipton, *Elon Musk's SpaceX, Already a Leader in Satellites, Gets Into the Spy Game*, N.Y. TIMES (Oct. 30, 2024), http://bit.ly/4kTl48t.

[4] *Global Space Launch Activity in 2024*, BRYCETECH, http://bit.ly/4k1hfgl.

[5] Eric Lipton & Kenneth Chang, *Trump Has Options to Punish Musk Even if His Federal Contracts Continue*, N.Y. TIMES (June 6, 2025), http://bit.ly/45EOcfg.

[6] *Supra* n.3.

contracts to SpaceX over the past decade, making SpaceX one of the largest federal contractors. Because of this work, the company reportedly handles some of the most sensitive government information available to civilians, including information classified as "sensitive compartmented information" or "special access programs."[7]

### B. Starlink

Starlink is a subsidiary of SpaceX. It provides high-speed internet via a network of satellites.[8] Starlink's services have strategic importance for America's national security interests.

Starlink provides important and sensitive services to the American government. The Department of Defense ("DoD") reportedly has come to rely heavily on Starlink's global satellite internet service for advanced command and control.[9] Starlink also is important to Navy communications; the Naval Information Warfare Systems Command has said that its plans to have Starlink available on all Navy ships.[10] During Musk's tenure at the Department of Government Efficiency ("DOGE"), the agency also reportedly installed Starlink at the White House and other agencies, allowing DOGE workers to bypass information security controls.[11] This raised concerns from the Secret Service and others that Musk and Starlink could compromise national security. *Id.*

The company also is vital to communication in other countries. Musk has demonstrated that he is able and willing to enable or disable the service in ways that can significantly affect American strategic interests. Most notably, Ukraine's military depends on Starlink to communicate and operate combat drones and other military systems. In October 2022, Musk suggested that

---

[7] *See, e.g.*, Ex. 1. (All cited exhibits are attached to the Declaration of Dana R. Green.)

[8] *See, e.g.*, Kinza Yasar, *Definition: Starlink*, TECHTARGET (Oct. 7, 2024), http://bit.ly/4eeNCH6.

[9] Courtney Albon, *Reliant on Starlink, Army Eager for More SATCOM Constellation Options*, DEF. NEWS (Aug. 21, 2024), http://bit.ly/46cfNo6.

[10] Konstantin Toropin, *Pentagon Silent on Elon Musk and Starlink Risks as Military Use Expands*, MILITARY.COM, http://bit.ly/43WbQ5A.

[11] Ex. 2.

Ukraine should compromise to end its war with Russia, leading to a public spat with Ukrainian leadership.[12] Musk then suggested he might terminate Ukraine's Starlink service. DoD responded by acknowledging the importance of Starlink to Ukraine's defense and stating that it was working to secure stable communication for Ukraine.[13] DoD subsequently signed a contract to finance Starlink in Ukraine.[14]

In February 2023, SpaceX stated that it would prevent Ukraine from using Starlink to control drones, a critical weapon in the war.[15] The announcement prompted diplomatic protests by Ukraine.[16] Six months later, Musk announced that he blocked a Ukrainian operation "to sink most of the Russian fleet at anchor" by personally declining Ukraine's request to activate Starlink in the Black Sea.[17]

Following President Trump's inauguration, his administration pressured Ukraine to assign some of Ukraine's mineral wealth to the United States. During negotiations, Musk asserted that Ukraine's "entire front line would collapse" if he turned off Starlink, which Ukrainian officials publicly interpreted as a threat.[18] Secretary of State Marco Rubio denied it was a negotiating tactic but reasserted that "without Starlink Ukraine would have lost this war long ago and Russians would

---

[12] Graeme Massie, *'F*ck Off!': Ukraine Ambassador Tells Elon Musk Where to Go After Tesla Boss Tries Twitter Poll on War*, INDEPENDENT (Oct. 4, 2022), http://bit.ly/4lePCRS.

[13] Tara Copp & Lolita Baldor, *Musk Seeks US Funding of Ukraine Satellite Network, Official Says*, DEF. NEWS (Oct. 14, 2022), http://bit.ly/4kQsucI.

[14] Mike Stone & Joey Roulette, *SpaceX's Starlink Wins Pentagon Contract for Satellite Services to Ukraine,* REUTERS (June 1, 2023), https://bit.ly/4lkYDsG.

[15] Joey Roulette, *SpaceX Curbed Ukraine's Use of Starlink Internet for Drones—Company President*, REUTERS (Feb. 9, 2023), http://bit.ly/3GcP2oX.

[16] Dan Sabbagh, *Fury in Ukraine as Elon Musk's SpaceX Limits Starlink Use for Drones*, GUARDIAN (Feb. 9, 2023) http://bit.ly/45WrEH1.

[17] Ex. 3.

[18] *After Poland Spat, Musk Vows Ukraine Can Keep Starlink*, VOICE OF AM. (Mar. 9, 2025), http://bit.ly/44hLoCs.

be on the border with Poland."[19] Musk later appeared to back down, writing that "no matter how much I disagree with the Ukraine policy, Starlink will never turn off its terminals."[20] Ukraine subsequently granted the United States significant revenue from its mineral resources.[21]

Because Starlink's service bypasses local infrastructure and government control, Musk has significant power to affect freedom of communication in certain countries. Musk has sometimes used that power to support certain geopolitical outcomes. For example, in October 2023, Musk stated that Starlink "will support connectivity to internationally recognized aid organizations in Gaza."[22] The Israeli communications minister responded directly to Musk, "Israel will use all means at its disposal to fight this," arguing that Starlink access should be conditioned on the release of Israeli hostages.[23] A month later, Musk met with Israeli leadership; the government then announced that Israel and Musk had reached a "significant agreement [that] Starlink satellite units can only be operated in Israel with the approval of the Israeli Ministry of Communications, including the Gaza Strip."[24]

In another example, in 2022 the Iranian regime disabled the internet to suppress protests. Musk wrote that he would try to provide Starlink service in the country and, later, that he was "activating Starlink" in Iran.[25] Three years later, Iran again restricted internet access, blocking

---

[19] Ex. 4.

[20] Ex. 5.

[21] Andrew E. Kramer, et al., *The U.S.-Ukraine Mineral Deal: What We Know*, N.Y. TIMES (May 1, 2025), http://bit.ly/40luXn8.

[22] Ex. 6.

[23] Ex. 7.

[24] Ex. 8.

[25] Reuters, *U.S. Adjusts Sanctions to Help Iranians Evade Online Surveillance Amid Protests Over Woman's Death*, NBC NEWS (Sept. 24, 2022), http://bit.ly/4l6eXhl.

outside news sources.[26] In response to a Fox News host saying, "Elon Musk can put the final nail in the coffin of the Iranian regime by providing Star link [sic] internet to the Iranian people," Musk responded, "The beams are on."[27]

    *C. Government Service*

In 2024, Musk became increasingly involved in national politics, campaigning in support of Donald Trump.[28] During the campaign, then-candidate Trump stated that Musk would co-lead a new government agency "to dismantle Government Bureaucracy."[29] On January 20, 2025, the President issued an executive order creating DOGE, and Musk became a special government employee and adviser to the President.[30]

The government has made conflicting statements about the scope of Musk's authority as a government employee. But a federal judge recently concluded that whatever his title on paper, Musk was substantially involved in the administration of DOGE.[31] The court found that Musk led or was involved with such actions as shutting down USAID and CFPB headquarters, terminating key employees at USDA and NNSA, making sudden changes in policy at FEMA, and "gaining access to agency computer systems; identifying grants, contracts, and employees to be terminated; using government-wide emails to monitor employees' weekly activities."[32]

---

[26] Kevin Collier, *Iran Plunged Into an Internet Near-Blackout During Deepening Conflict*, NBC NEWS (June 17, 2025), http://bit.ly/3Ta5clY.

[27] Ex. 9.

[28] Ex. 10.

[29] Order, *Does 1-26 v. Musk*, No. 25-cv-462 (D. Md. Mar. 18, 2025), Dkt. 73 at 2, https://storage.courtlistener.com/recap/gov.uscourts.mdd.576293/gov.uscourts.mdd.576293.73.0.pdf.

[30] *Id.* at 2, 5. When Musk departed government service on May 28, 2025, he and the administration referenced that it marked the end of the 130-day tenure for special government employees. That would place his hiring at approximately the same time that the President created DOGE, in mid-January. *See, e.g.*, Nandita Bose, et al., *Elon Musk Leaving Trump Administration, Capping Turbulent Tenure*, REUTERS (May 29, 2025), http://bit.ly/4ngRPyd.

[31] *Supra* n.29 at 33–35.

[32] *Id.* at 28–29, 33–34.

Concerns repeatedly have been raised that Musk gained access, via his government service, to sensitive government information that he was not qualified to have, jeopardizing national security.[33] And Musk's actions as leader of DOGE have impacted the lives of millions of people. The shuttering of USAID, alone, has had far-reaching consequences for international relations and public health, affecting American businesses, farms and nonprofits, and aid recipients.[34] At the end of May, Musk's 130-day tenure as a special government employee came to an end, and he left government service.[35]

## II.    MUSK'S SECURITY CLEARANCE

Musk and government officials have publicly discussed his security clearance multiple times. For example, in October 2024, Musk told a public town hall that he had a top-secret clearance.[36] However, at that time Musk reportedly lacked authorization to access "sensitive compartmented information" or "special access programs."[37] In February 2025, in response to concerns about Musk accessing restricted information, Congressman Mark Green stated in a hearing that "Elon Musk does have a security clearance, he has a top secret security clearance."[38] Musk reposted a clip of Green's statement on social media, writing, "I've had a top secret clearance for many years and have clearances that themselves are classified."[39]

---

[33] *See, e.g.*, Ellie Quinlan Houghtaling, *Does Elon Musk Even Have Security Clearance to Access Sensitive Data?*, NEW REPUBLIC (Feb. 4, 2025), http://bit.ly/3IaYXvO; David E. Sanger, *The Musk Team's Treasury Access Raises Security Fears, Even After Its Halt Was Ordered*, N.Y. TIMES (Feb. 8, 2025), http://bit.ly/4esH73B; James Goldgeier & Elizabeth N. Saunders, *Does DOGE Pose a National Security Risk?*, FOREIGN AFFS. (Feb. 7, 2025), http://bit.ly/4lfszXT.

[34] *Supra* n.29 at 37–40.

[35] Chris Megerian, *Elon Musk Is Leaving the Trump Administration After Leading Effort to Slash Federal Government*, ASSOCIATED PRESS (May 28, 2025), http://bit.ly/4ngUQi3; Stephen Fowler, *Elon Musk Is Leaving the Federal Government. What's Next for DOGE?* NPR (May 30, 2025), http://bit.ly/4kbf9uy.

[36] Ex. 1.

[37] *Id.*

[38] Ex. 11.

[39] *Id.*

## III.    MUSK'S DRUG USE AND FOREIGN CONTACTS

As set out by the Government, security clearances can be denied, revoked, or subject to conditions for many reasons. Among the factors are contacts with foreign nationals and drug use, which must be reported. Decl. of Charles D. Watters ("Watters Decl."), ECF No. 11, ¶ 15. Government contractors can lose their security clearances over "drug abuse," which includes using an illegal drug or a prescribed drug "in a manner that deviates from approved medical direction." 32 C.F.R. § 147.10(a)(3). That is because "such behavior may lead to physical or psychological impairment and because it raises questions about a person's ability or willingness to comply with laws, rules, and regulations."[40] Foreign contacts are also a basis for denial, revocation, or conditioned security clearance for multiple reasons, including the risk that an individual may be "manipulated or induced" to act "in a way inconsistent with U.S. interests or otherwise made vulnerable to pressure or coercion."[41] Conditions that "may be disqualifying" include expressing a "desire to help a foreign person, group, or country," "failure to report . . . association with a foreign person," "substantial business, financial, or property interests in a foreign country," and "indications" that foreign nationals are "acting to increase the vulnerability of the individual."[42] All of these factors appear to be implicated here.

### A.  Musk's Drug Use

Musk has publicly disclosed using drugs and discussed its impact on his security clearance and government work. In 2018, Musk famously smoked marijuana on Joe Rogan's podcast.[43] As

---

[40]    Off. of Dir. of Nat'l Sec., Security Executive Agent Directive 4, at 17 (2017), https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf.

[41] *Id.* at 9.

[42] *Id.* at 9–10.

[43] *See* Full Send Podcast, *Elon Musk Reveals His Knowledge on Aliens, Challenges Putin to UFC, and Predicts WW3*, YOUTUBE (Aug. 4, 2022), https://www.youtube.com/watch?v=fXS_gkWAIs0&t=1701s.

a result, Musk has said, the government required him and "all of SpaceX" to undergo "3 years of random drug testing,"[44] which appears to corroborate news reporting that, between approximately 2018 and 2021, he had to undergo drug tests to obtain a top-secret clearance in 2022.[45]

Since 2022, there have been additional reports of Musk using illegal and controlled substances. Musk has publicly responded, denying that his drug use is illegal or excessive but confirming that he uses prescription ketamine. For example, in June 2023, The Wall Street Journal ("The Journal") reported that Musk was using ketamine. Musk responded that "Ketamine is a much better option, in my opinion [than SSRI antidepressants]. I have a prescription for when my brain chemistry sometimes goes super negative."[46]

In January 2024, The Journal reported that Musk used cocaine, ecstasy, LSD, hallucinogenic mushrooms, and ketamine, and that leaders at his companies Tesla and SpaceX were concerned about it.[47] Musk's drug use reportedly violated his companies' antidrug policies and put Musk's security clearance at risk. *Id.* On January 7, 2024, Musk responded, claiming that during the three years he was randomly tested after the Rogan podcast, "[n]ot even trace quantities were found of any drugs or alcohol."[48] By omission, Musk's statement suggested that he was *not* randomly tested after that three-year period. Musk also emphasized his own professional success,

---

[44] Ex. 12 ("After that one puff with [Joe] Rogan, I agreed, at NASA's request, to do 3 years of random drug testing. Not even trace quantities were found of any drugs or alcohol."); *supra* n.43, at 28:24–29:49 ("I did get a lot of backlash [for the Joe Rogan podcast]. . . . It was pretty nutty, actually, I had to . . . have, like, random drug tests and stuff after that to prove that I'm not, like, a drug addict . . . [by] the federal government. . . . They drug tested me for everything. . . . It was like a whole year of random drug tests. . . . The consequences for me and for SpaceX were not good because it's federally illegal and SpaceX has federal contracts so unfortunately it wasn't just me. All of SpaceX had to have random drug tests.").

[45] Ex. 1.

[46] Ex. 13.

[47] Ex. 14.

[48] Ex. 12.

joking, "Whatever I'm doing, I should obviously keep doing it!" and, "If drugs actually helped improve my net productivity over time, I would definitely take them!"[49]

In February 2024, The Journal reported that Musk used illegal drugs with members of Tesla's board, and "the volume of drug use by Musk and with board members has become concerning."[50] It reported that as far back as 2022, friends had urged Musk "to go to rehab." *Id.* The following month, during an interview, Musk again confirmed he has a ketamine prescription for "times when I have, um, sort of a . . . a negative chemical state in my brain. Like depression, I guess . . . And ketamine is helpful for getting one out of a negative frame of mind."[51] Musk denied abusing the drug and said he uses a small amount of ketamine "once every other week or something like that."[52]

In May 2025, Musk denied a report by The Times that he was heavily using ketamine and other drugs,[53] writing, "I tried *prescription* ketamine a few years ago and said so on X[.com], so this [is] not even news. It helps for getting out of dark mental holes, but I haven't taken it since then."[54] Those statements appear at odds with Musk's prior remarks that he used prescription ketamine more regularly. Two weeks later, Musk posted online what appeared to be negative urine test results obtained from a commercial lab, apparently to refute that he uses drugs.[55]

---

[49] Exs. 15, 16.

[50] Kirsten Grind, et al., *The Money and Drugs that Tie Elon Musk to Some Tesla Directors*, WALL ST. J. (Feb. 3, 2024) http://bit.ly/4lfuMm9.

[51] WSJ News, *Watch: Don Lemon Asks Elon Musk About Drug Use* (Mar. 18, 2024), YOUTUBE, https://www.youtube.com/watch?v=3Xy8_hJnCy4 at 1:10–1:54.

[52] Don Lemon, *Elon Musk Extended Interview Part 4: Relaxation & Ketamine Drug Therapy* (Mar. 18, 2025), YOUTUBE, https://www.youtube.com/watch?v=ClHJ7hCqIoE at 5:25–11:24.

[53] *See, e.g.*, Kirsten Grind & Megan Twohey, *On the Campaign Trail, Elon Musk Juggled Drugs and Family Drama*, N.Y. TIMES (May 31, 2025), http://bit.ly/44lJnFn.

[54] Ex. 17.

[55] Ex. 18.

### B. Musk's Foreign Contacts

Musk's international business ventures have repeatedly raised public concerns about his vulnerability to foreign influence. For several years, the federal government reportedly monitored foreign nationals meeting with Musk out of concern that they might try to influence him.[56] Between 2021 and 2024, Musk met or spoke at least 32 times with leaders from at least 13 different countries, including China, Israel, Turkey, India, Hungary, and Brazil.[57] In several instances, foreign leaders publicly solicited him to invest in their countries.[58] In others, Musk actively supported politicians in countries where he has financial interests. For example, Musk has cultivated a relationship with the President of Argentina and the two men have publicly pledged to "work together" on shared political objectives and access to lithium, an essential component in Tesla cars.[59]

In October 2024, The Journal also reported that Musk had been in regular contact with Russian President Vladimir Putin and other high-ranking Russian government officials, discussing geopolitical matters.[60] The Journal reported that Putin had even asked Musk to avoid activating Starlink over Taiwan, to appease China.[61] In response to the reporting, NASA Administrator Bill Nelson called for an investigation.[62] A spokesman for Russia appeared to partially corroborate the

---

[56] Ex. 19.

[57] Clare Duffy & Way Mullery, *Elon Musk Has Met With Politicians From at Least 13 Different Countries: Here's What He Has Talked About*, CNN (Oct. 25, 2024), https://www.cnn.com/2024/10/25/tech/elon-musk-political-meetings-influence-dg.

[58] *Id.*

[59] Breck Dumas, *Elon Musk Hosts Argentine President Javier Milei at Tesla Headquarters*, FOX BUS. (Apr. 13, 2024), http://bit.ly/44jVu5v.

[60] Ex. 20.

[61] *Id.*

[62] *Id.*

reporting, asserting that Musk had one telephone call with Putin.[63] Musk similarly has said he spoke with Putin once, in 2021.[64]

## IV.    REVIEWS OF MUSK'S CLEARANCES

Whether Musk should have a security clearance has been a matter of public debate, congressional discussion, and government review. After The Journal reported in 2023 about Musk's drug use, SpaceX lawyers reportedly advised against Musk seeking a higher clearance "to avoid questions about his drug use and contact with foreign nationals" and out of concern that he might even risk "losing the top-secret clearance he already has."[65] However, the government reportedly took no action at that time.[66]

As set out above, in October 2024, the head of NASA called for an investigation of Musk's contacts with Russia.[67] The next month, in November 2024, the chairman of the Senate Armed Services Committee similarly called on DoD and the Department of Justice to investigate Musk and his communications with top Russian officials.[68] The letter noted Musk's companies are "deeply integrated into our defense and intelligence space programming," and "[c]ommunications between Russian government officials and any individual with a security clearance have the potential to put our security at risk." The letter urged "immediate review" regarding whether Musk

---

[63] *Id.*

[64] Ex. 21.

[65] Ex. 1.

[66] *Id.*

[67] Ex. 20.

[68] Letter from Senator Jeanne Shaheen and Senator Jack Reed to Robert P. Storch, Inspector General and Merick Garland, Attorney General (Nov. 15, 2024), https://www.shaheen.senate.gov/imo/media/doc/241115lettertoigdoj.pdf.

should be excluded from government contracts. In a separate letter to the Air Force, he asserted that Musk's "reported behavior could pose serious risks to national security."[69]

In December 2024, the Secretary of the Air Force responded that the Department "takes security matters very seriously, and I share your concerns."[70] The Air Force, DoD's Office of Inspector General, and the Office of the Under Secretary of Defense for Intelligence and Security each reportedly initiated reviews of Musk for alleged failure to properly report contacts with foreign leaders and prescription drug use.[71] The Air Force reportedly denied Musk high-level security access, citing potential security risks.[72] DCSA has not disclosed whether it took any action.

## V.    THE FOIA REQUEST

On September 17, 2024, Plaintiffs submitted the Request to DCSA seeking a list of security clearances for Musk. Ex. 23. On October 2, DCSA responded, stating it had identified two responsive pages but denying access under FOIA exemptions 6 and 7(C), on the basis that the information is "privacy-related." Ex. 24. The Times appealed (Ex. 25), and on January 27, 2025 DCSA again denied the Request, asserting that Musk is a "private citizen" and the list of his security clearances "could constitute an unwarranted invasion of personal privacy." Ex. 26. But by the time of that denial, Musk was a special government employee. *See supra* n.29. The Times petitioned DCSA for reconsideration, pointing out that error. Ex. 27. On February 18, 2025, DCSA again denied the Request, asserting without reasoning that its position remained the same. Ex. 28.

---

[69] Letter from Senator Jeanne Shaheen and Senator Jack Reed to Frank Kendall, Secretary U.S. Air Force (Nov. 15, 2024), https://www.shaheen.senate.gov/imo/media/doc/241115lettertoseckendall.pdf.

[70] Ex. 22.

[71] *Id.*

[72] *Id.*

## **LEGAL STANDARD**

FOIA requires that government records be made available to the public unless a statutory exemption applies. 5 U.S.C. § 552(a)(3)(A), (b)(1)–(9). "The basic purpose of FOIA reflect[s] a general philosophy of full agency disclosure . . . ." *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (cleaned up). The agency always "bears the burden of demonstrating that any claimed exemption applies." *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005); *see* 5 U.S.C. § 552(a)(4)(B). To effectuate FOIA's "general principle of broad disclosure," exemptions must be "given a narrow compass," and "all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016).

A court reviews de novo an agency's decision to withhold information from the public. *See* 5 U.S.C. § 552(a)(4)(B). The agency's decision is entitled to no judicial deference. *Bloomberg*, 601 F.3d at 147. The Government is not entitled to summary judgment unless its filings "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record or by evidence of agency bad faith." *ACLU Immigrants' Rts. Project v. U.S. Immigr. & Customs Enf't*, 58 F.4th 643, 651 (2d Cir. 2023). Although courts review reasonably detailed agency affidavits with a presumption of good faith, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not carry the Government's burden." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 486 F. Supp. 3d 669, 689 (S.D.N.Y. 2020) (cleaned up). In contrast, "summary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *Knight First Amend. Inst. v. Ctrs. for Disease Control*, 560 F. Supp. 3d 810, 820 (S.D.N.Y. 2021).

**ARGUMENT**

The Government's sole bases for withholding are FOIA exemptions 6 and 7(C). Exemption 6 applies only to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7). Both exemptions require the Government to show not just that the information implicates a substantial personal privacy interest but also that the privacy interest outweighs any public interest in disclosure. Here, the Government cannot meet that burden.

## I.   THE GOVERNMENT IMPROPERLY CONFINES ANALYSIS OF THE EXEMPTIONS TO SEPTEMBER 2024

As an initial matter, DCSA attempts to cabin this Court's review to a specific point in time: September 2024, when the agency searched for relevant records. The Government's approach treats Musk as just a private citizen, ignoring his reduced privacy interest as a government official and the public interest in his government work. Illogically, the Government's position would also require this Court to ignore subsequent statements from Musk himself and other federal officials discussing his security clearances. The Court should reject this narrow approach.

Although, "as a *general* rule, a FOIA decision is evaluated as of the time it was made and not at the time of a court's review," *N.Y. Times Co. v. DOJ*, 756 F.3d 100, 110 n.9 (2d Cir. 2014) (emphasis added), that is not a requirement. For example, in *Florez v. CIA*, the Second Circuit held that it could properly consider events that occurred after the FOIA request was made when the agency had already "voluntarily undertaken and completed any reprocessing that could arise from remanding." 829 F.3d at 188 (cleaned up). This was the "most sensible approach" because to hold

15

otherwise "would not serve the purpose of FOIA or the interests of justice." *Id.* The court specifically held that "because the [agency] had already reviewed the [relevant] documents and reaffirmed its Glomar response, [it knew] how the [agency] would respond to [plaintiff's] renewed request" and held there was "no reason" not to consider "the reality in which this action proceeds." *Id.* at 188–89; *see also N.Y. Times*, 756 F.3d at 110 n.9 (holding that post-request disclosures were properly considered where they went "to the heart of the contested issue").

So too here. Whether the Government may withhold Musk's list of security clearances even after he became a senior government official is an issue properly before the court. As set out above, when DCSA denied the administrative appeal, Musk had already assumed leadership of DOGE. *See supra* n.30. When The Times sought reconsideration, pointing out Musk's change in employment, DCSA reaffirmed its decision. *See* Ex. 28 ("DCSA's decision to withhold the information has not changed nor has [the agency's] opinion as to Mr. Musk's privacy interests in these records."). By then, Musk had also openly stated he held a top-secret clearance.[73] As in *Florez*, the Government has already made clear how it would respond to a renewed request, and there is no reason for the Court to ignore the reality of Musk's changed circumstances.

## II.    EXEMPTION 7(C) DOES NOT APPLY BECAUSE THE RECORD WAS NOT COMPILED FOR A LAW ENFORCEMENT PURPOSE.

The Government also wrongly relies on exemption 7(C) to withhold the list of Musk's clearances because that list was not "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). To invoke exemption 7 at all, "the Government has the burden of proving the existence of such a compilation for such a purpose." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 153 (1989). It "must establish a rational nexus between the agency's activity in

---

[73] Ex. 1.

compiling the documents and its law enforcement duties." *Brennan Ctr. for Just. v. Dep't of Homeland Sec.*, 331 F. Supp. 3d 74, 97 (S.D.N.Y. 2018) (cleaned up). As the D.C. Circuit has explained, "the focus is on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Jefferson v. DOJ*, 284 F.3d 172, 176–77 (D.C. Cir. 2002) (cleaned up). Accordingly, "[c]ourts have generally interpreted Exemption 7 as applying to records that pertain to specific investigations conducted by agencies, whether internal or external, and whether created or collected by the agency—in other words, investigatory files." *Fams. for Freedom v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375, 397 (S.D.N.Y. 2011); *see also Bartko v. DOJ*, 898 F.3d 51, 64 (D.C. Cir. 2018) ("To qualify as law-enforcement records, the documents must arise out of investigations which focus directly on specifically alleged illegal acts which could, if proved, result in civil or criminal sanctions." (cleaned up)).

The Government has not made this threshold showing. Its declaration and brief repeatedly focus on "[r]ecords related to DCSA background investigations." Watters Decl. ¶ 10; *see also id.* (referring to the "personnel vetting process" and the "background investigation process"); Gov't Br. 8 (contending that "conducting background investigations 'inherently' relates to law enforcement"). But these arguments are not relevant to the list at issue. Although courts have found that "documents collected in a background investigation," *Mittleman v. Off. of Pers. Mgmt.*, 76 F.3d 1240, 1241 (D.C. Cir. 1996), or describing an agency's "investigatory processes" for background checks, *Morley v. CIA*, 508 F.3d 1108, 1128 (D.C. Cir. 2007), fall within exemption 7, here the Government concedes that The Times's Request "does not seek the underlying investigative file," Gov't Br. 9; *see also* Watters Decl. ¶ 16. Rather, the requested record is merely a list of clearances held by Musk, and it is located in a database that documents "eligibility

determinations." Watters Decl. ¶ 6. The list is akin to a personnel record documenting an employee's hire: though it may indirectly reflect the *outcome* of a background check, it was not compiled as part of the investigatory or vetting *process*.

Confirming this conclusion is the Government's inability to identify any "enforcement proceeding" to which such a list would pertain. *Jefferson*, 284 F.3d at 177. DCSA asserts that "[b]ackground investigations are intended in part to prevent . . . criminal disclosures" of classified information, Gov't Br. 8, but it does not (and cannot) claim that this list was compiled for the purpose of preventing or probing any such disclosure. Similarly, the agency's generic assertion that the record was "compiled to protect national security," *id.* 7, also falls flat. Even if that were true for information gathered by DCSA during background investigations, the Government has not shown what role the list of clearances held by Musk would play in preventing a security breach. *See, e.g.*, *N.Y. Times Co. v. DOJ*, 390 F. Supp. 3d 499, 514 (S.D.N.Y. 2019) (explaining that "just because FARA is a national security tool, it does not mean that all documents created by the FARA Unit are compiled for law enforcement purposes"). Accordingly, DCSA has not carried its burden of showing that exemption 7 applies.

## III.    THERE IS A SUBSTANTIAL PUBLIC INTEREST IN THE RECORD

In any event, whether Musk is treated as a civilian or as a government employee and whether evaluated under exemption 6 or 7(C), the outcome here is the same: there is a substantial public interest in understanding what security clearances Musk holds, which outweighs any cognizable privacy interest.

Exemptions 6 and 7(C), like all FOIA provisions, are to be narrowly construed. *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011). They do not permit *all* withholding of information about individuals; that would obviously frustrate the purpose of FOIA. Instead, under both exemptions, any privacy interest must be weighed against the public interest, meaning whether

disclosure would "contribut[e] significantly to public understanding of the operation or activities of the government." *DOD v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 495 (1994).

Under exemption 6, only a "clearly unwarranted invasion of personal privacy" permits withholding. 5 U.S.C. § 552(b)(6). This "clearly unwarranted" requirement imposes a "heavy burden" on the Government and instructs that the balance must "tilt . . . in favor of disclosure." *Morley*, 508 F.3d at 1127 (cleaned up); *see also Wash. Post Co. v. Dep't of Health & Hum. Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982) ("[U]nder Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act."). Although the standard for evaluating privacy interests under exemption 7(C) is "somewhat broader," it still requires the agency to prove that "the invasion of personal privacy resulting from release of the information would outweigh the public interest in disclosure." *Perlman v. DOJ*, 312 F.3d 100, 106 (2d Cir. 2002), *vacated*, 541 U.S. 970 (2004), *reaff'd*, 380 F.3d 110 (2d Cir. 2004). The Government plainly cannot make that showing here.

First, as a senior government employee, Musk performed government acts. He led a dramatic effort to reshape the federal government and reorder the country's international relations, shutting down government programs, terminating key employees, withdrawing international aid, and gaining access to sensitive government data in the process. As the Maryland district court concluded, he exercised broad federal power. *See supra* Section I.C.

It is of substantial public interest to know if such an official holds an appropriate security clearance. This is the very reason why Musk, Representative Green, and others have publicly asserted that Musk has a top-secret security clearance—it is a matter of significant public concern whether the person who controls SpaceX and Starlink and who led DOGE has been deemed trustworthy enough by the Government to access the sensitive information associated with those

roles. *See, e.g.*, *Perlman*, 312 F.3d at 107–08 (greater public interest in disclosure of information related to job functions of high-ranking public officials). It is also of substantial public interest to know whether a person with his authority has been subject to specific conditions and whether he has complied with them. It is of substantial public interest if DCSA had denied, revoked, or conditioned a clearance for reasons that could influence Musk's governmental decision-making, such as foreign ties. And it is of substantial public interest to know if Musk and other officials were truthful when they asserted that he held a top-secret security clearance and had unfailingly passed years of random drug tests.

The Government argues that Musk's government service is irrelevant, that only facts existing in September 2024 should be considered, and that the public interest is limited to *DCSA*'s government activities, not Musk's. Gov't Br. 1, 11. That is wrong. *See supra* Section I. But even adopting the Government's position, it defies logic to say that in September 2024 the records "would not give any meaningful insight into matters such as the thoroughness of DCSA's investigation, the fairness and accuracy of its adjudication, or its response to any new information," Gov't Br. 12.

In September 2024, Musk was no ordinary civilian. He controlled technology and infrastructure critical to national security and owned two companies with access to highly classified information. He had a demonstrated ability to wield that technology in ways that could advantage or disadvantage American strategic interests. By his own account, he had the power to enable or block major military action. In other words, he was a person for whom the thoroughness, fairness, accuracy, and responsiveness of DCSA's clearance process was particularly consequential to the public.

Between 2018 and 2022, the Government reportedly withheld and conditioned Musk's security clearance on random drug testing after a one-time use of marijuana. Between 2022 and 2024, there were repeated and more serious allegations that Musk was using illegal and prescription drugs to a degree that impaired his judgment, and Musk himself appeared to indicate that he was struggling with depression. Whether or not the allegations were accurate, such information ordinarily should prompt DCSA action—as it did in 2018. Whether DCSA took such action, whether it acted with the same rigor as in 2018, whether it imposed equivalent conditions, and whether it enforced those conditions would speak to the thoroughness, fairness, accuracy, and responsiveness of the DCSA clearance process. The Government's increasing dependence on Musk's companies since 2018, and Musk's increasing political influence, only enhance the public interest in understanding how Musk's clearance was handled.

Separately, between 2021 and 2024, Musk's contacts with foreign leaders—including Vladimir Putin—were also public information; many foreign leaders were transparently attempting to influence Musk's investments and interests; and Musk stood to substantially benefit financially from positive relationships with foreign authorities. Whether DCSA took action on that public information would, again, reflect on its thoroughness, responsiveness, and fairness. And information about attached conditions would shed light on whether Musk is complying with them and therefore whether DCSA's oversight and enforcement are effective. In short, information about the clearances Musk received would provide important insight into DCSA's performance of its essential functions. *See e.g.*, *Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984) (holding that there was public "interest in knowing that a government investigation itself is comprehensive . . . and that those who are accountable are dealt with in an appropriate manner").

Information about Musk's security clearances would also provide important public insight into other agencies' activities. For example, it has been reported that, before 2022, Musk did *not* have a top-secret security clearance.[74] Whether Musk lacked a necessary clearance at any point would provide important insight into whether defense and intelligence agencies appropriately entrusted Musk to lead and control sensitive, national security work.

Finally, the Government argues that "DCSA has a general policy and practice of not disclosing individuals' security clearance information" and that if the records at issue in this case must be disclosed, then it "would not be possible" for DCSA to withhold security clearance information about other individuals. Gov't Br. 13. That is meritless. An agency's "policy and practice" is entitled to no deference. *Bloomberg*, 601 F.3d at 147. And a blanket policy against disclosure is not consistent with FOIA, which requires a context-specific analysis. Here, the particular facts do not permit withholding of this particular list.

## IV. ANY PRIVACY INTEREST IN THE RECORD IS MINIMAL

By DCSA's own admission, this case is strictly about "a report generated from a Defense Department database that shows any security clearances that Elon Musk held." Gov't Br. 1. This case is *not* about Musk's Questionnaire for National Security Positions, nor is it about the investigative files and information compiled when he applied for any security clearance. The Government's extensive discussion about the sensitivity of those materials is irrelevant. *Id.* at 1–3. Nevertheless, the Government attempts to conflate investigatory documents with the single document sought here to suggest a more compelling privacy interest where only a *de minimis* one exists—if one exists at all.

---

[74] Ex. 1.

22

Both exemption 6 and 7(C) require the Government to show that disclosure would compromise a "substantial, as opposed to a de minimis, privacy interest." *Multi AG Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008); *see United Am. Fin., Inc. v. Potter*, 531 F. Supp. 2d 29, 46 (D.D.C. 2008) ("The privacy inquiry of Exemptions 6 and 7(C) is essentially the same" (cleaned up)). This sort of interest arises where release of the information "could subject the person to harassment, disgrace, loss of employment, or friends." *Am. Fed'n of Gov't Emps., Local 1760 v. Fed. Lab. Rels. Auth.*, 786 F.2d 554, 556 (2d Cir. 1986); *see also News-Press v. Dep't of Homeland Sec.*, 489 F.3d 1173, 1203–04 (11th Cir. 2007) (rejecting assertion that disclosure of individuals' addresses would lead to solicitations); *cf. Dep't of State v. Ray*, 502 U.S. 164, 176 n.12 (1991) (disclosure of identities of Haitian deportees "would subject them to possible embarrassment and retaliatory action" for their attempts to emigrate). "If no significant privacy interest is implicated, FOIA demands disclosure." *Multi AG Media*, 515 F.3d at 1229 (cleaned up).

The Government has not and indeed cannot establish that Musk has that kind of privacy interest in this document. For starters, the law is clear that merely identifying whether Musk holds an active clearance does not inherently reveal derogatory information. The Supreme Court has held that "[a] clearance does not equate with passing judgment upon an individual's character." *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988). Indeed, "[t]o be denied clearance on unspecified grounds in no way implies disloyalty or any other repugnant characteristic." *Id.*; *see also Peter B. v. CIA*, 620 F. Supp. 2d 58, 72 (D.D.C. 2009) (holding that "a statement that simply indicates a person's ineligibility for a security clearance, without more, would not be an injury to reputation"); *Stehney v. Perry*, 907 F. Supp. 806, 821 (D.N.J. 1995) ("[C]ourts have universally held that denial of a clearance does not stigmatize the person in any way that implicates a liberty interest."); *Jamil v. Sec'y, DOD*, 910 F.2d 1203, 1209 (4th Cir. 1990) (revocation of security

clearance "does not constitute an adjudication of one's character"). In short, the Government's argument fails as a matter of law.

Closely on point is *WP Co. v. Department of Defense*, which held that information pertaining to security clearances "only minimally implicates a personal privacy interest." 626 F. Supp. 3d 69, 82 (D.D.C. 2022) (cleaned up). There, the plaintiff requested from DoD former military officials' applications for approval to hold foreign employment, documents that included the officials' current security clearances. *Id.* at 75. Rejecting the government's contrary assertion, the court found it "difficult to conceive of how disclosure of one's security-clearance level would embarrass or invite unwarranted intrusion." *Id.* at 82. Clearance information, the court explained, "is not inherently personal but is a status attendant to performance of one's official duties." *Id.* Here, too, Musk's clearances are simply a result of his role leading a major federal contractor and government agency, and DCSA has not shown how disclosing a *list* of those clearances—as opposed to his investigatory file—would cause embarrassment or unwarranted intrusion. *Cf.* Watters Decl. ¶ 16 (stating only that disclosure of "private information DCSA gathers during an investigation . . . could be embarrassing to disclose").

Even setting aside these precedents, DCSA's position that the "decision to deny or revoke access would reveal that the agency's investigation (or continuous evaluation) had uncovered derogatory information," *id.* ¶ 20, defies basic logic. The Government's bases for denial or revocation are so numerous and vague that the mere outcome reveals nothing derogatory. As DCSA explains, security clearances are granted upon a "comprehensive" review of "[a]ll available, reliable information about the person, past and present, favorable and unfavorable." *Id.* ¶¶ 12, 13. This includes thirteen topics that may inform whether an individual is fit to receive a security clearance. *Id.* ¶ 14. Many of these topics—such as "Foreign Influence, "Foreign Preference,"

"Outside Activities," and "Use of Information Technology"—do not inherently reflect any personal failing or wrongdoing. For example, an individual's "Foreign Influence" or "Foreign Preference" could simply indicate that an applicant has dual citizenship or foreign family members or business investments. *See Egan*, 484 U.S. at 528–29 (denial "may be based upon concerns completely unrelated to conduct, such as having close relatives residing in a country hostile to the United States").

In addition, any plausible privacy interest is further undercut by public statements from Musk himself and other government officials. As set out above, Musk has openly discussed his own security clearances, including by posting on social media that he has "had a top secret clearance for many years and ha[s] clearances that themselves are classified." Ex. 11. Members of Congress and other officials have discussed his security clearance in press conferences, congressional hearings, and public correspondence. *See e.g.*, *id.* Accordingly, DCSA cannot credibly assert that there is a substantial privacy interest here. *N.Y. Times Co. v. Dep't of Homeland Sec.*, 959 F. Supp. 2d 449, 453 (S.D.N.Y. 2013) (holding that "such privacy interest may be limited or eliminated entirely where the information at issue is already public"); *Citizens for Resp. & Ethics in Wash. v. U.S. Postal Serv.*, 557 F. Supp. 3d 145, 158 (D.D.C. 2021) ("With regard to already-public information, one can have no privacy interest if the person asserting his privacy is himself responsible for placing that information into the public domain." (cleaned up)). Ultimately, as a factual and legal matter, these records implicate a privacy interest of a "limited and minimal nature." *Lardner v. DOJ*, 638 F. Supp. 2d 14, 27–28 (D.D.C. 2009). On this basis alone, they should be disclosed.

DCSA also argues that there is a privacy interest in the record because security clearances sometimes are granted subject to a condition or with a waiver that reveals personal information.

The Government does not say, however, if any condition or waiver is attached to Musk's security clearance(s) or the bases for them. In this instance, *in camera* review may be required to properly evaluate the Government's claims. *See, e.g.*, *Ctr. for Pub. Integrity v. DOD*, No. 19-cv-3265, 2020 U.S. Dist. LEXIS 140591, at *5 (D.D.C. Aug. 6, 2020) ("*In camera* review is appropriate when such review is necessary for a district court to make a responsible de novo determination on the claims of exemption." (cleaned up)); *Neuman v. United States*, 70 F. Supp. 3d 416, 425 (D.D.C. 2014) (ordering *in camera* review where "Court [did] not have sufficient information to rule on the propriety of Defendants' reliance on Exemption 7(C)").[75]

In any event, it seems likely that the record at issue memorializes that at some point Musk was required to undergo random drug testing to obtain or maintain a security clearance—*because Musk himself has repeatedly and publicly said so*. *See, e.g.*, Ex. 11. There can be no privacy interest in information that the individual in question has already disclosed. *Citizens for Resp. & Ethics in Wash.*, 557 F. Supp. 3d at 158. To the extent that other conditions were imposed, that would not necessarily implicate a privacy interest. Indeed, the example that the Government offers in its own brief would not: a condition restricting access to certain types of information "related to a specific foreign country where the individual had a close familial or other connection." Watters Decl. ¶ 21. Courts have made clear that "the mere fact that one has relatives in a hostile country" and has been denied a clearance on that basis "in no way implies disloyalty or any other repugnant characteristic." *Molerio v. FBI*, 749 F.2d 815, 824 (D.C. Cir. 1984).

---

[75] As explained *supra* Section III, the public interest in disclosure would be even greater if the government was entrusting Musk with access to sensitive, national security information while simultaneously questioning his fitness to receive such access.

Even if any waiver or condition were to implicate substantial privacy concerns, redaction is the appropriate remedy, not withholding.[76] *See ACLU v. FBI*, 59 F. Supp. 3d 584, 588–89 (S.D.N.Y. 2014) ("[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."). The Government has not plausibly explained why redaction is not feasible. *See Ray*, 502 U.S. at 173 ("That burden remains with the agency when it seeks to justify the redaction of identifying information in a particular document . . . .").

Finally, the Government fails to articulate a foreseeable harm that would result from the disclosure of Musk's clearances. Unless disclosure is prohibited by law, FOIA's "foreseeable harm" requirement permits withholding only where the agency "reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i). Contrary to DCSA's suggestion, the requirement has "real teeth," *Colo. Wild Pub. Lands v. U.S. Forest Serv.*, 691 F. Supp 3d 149, 165 (D.D.C. 2023), and "imposes an independent and meaningful burden on agencies" seeking to withhold records under a FOIA exemption, *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) ("*RCFP*") (cleaned up).

Although some district courts have suggested that this requirement is automatically met when a privacy exemption applies, *see, e.g.*, *Ecological Rts. Found. v. EPA*, 541 F. Supp. 3d 34, 65 (D.D.C. 2021), such an approach cannot be squared with the Second Circuit's instruction that "[a]pplicability of a FOIA exemption is still necessary—but no longer sufficient—for an agency

---

[76] DCSA suggests that it could not redact or withhold information as it would still "clearly show the presence of derogatory information" and that its policy is "akin to a Glomar response." Gov't Br. 10. This is a red herring. First, the Government's reliance on *Stein v. CIA*, No. 17-cv-189, 2024 U.S. Dist. LEXIS 174014 (D.D.C. Sept. 26, 2024), is misplaced. In *Stein*, the court held that *redactions* were appropriately applied to information that would directly reflect an applicant's "psychological conditions, alcohol consumption, and sexual behavior." *Id.* at *6 (cleaned up). The categories of information here—conditions and waiver—would not directly reveal such information. Simply put, *Stein* does not justify wholesale withholding of the records. Second, this argument flatly fails in the face of the Trump administration's public revocation of security clearances. *See e.g.*, *Holding Former Government Officials Accountable for Election Interference and Improper Disclosure of Sensitive Governmental Information*, WHITE HOUSE (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/holding-former-government-officials-accountablefor-election-interference-and-improper-disclosure-of-sensitive-governmental-information/.

to withhold the requested information," *Seife v. FDA*, 43 F.4th 231, 235 (2d Cir. 2022). Instead, the foreseeable-harm requirement underscores the Government's burden to provide "a focused and concrete demonstration" of how the asserted privacy interests will actually be compromised. *Leopold v. DOJ*, 94 F.4th 33, 37 (D.C. Cir. 2024) (quoting *RCFP*, 3 F.4th at 370); *see, e.g.*, *Kendrick v. FBI*, No. 20-cv-2900, 2022 U.S. Dist. LEXIS 175454, at *15–16 (D.D.C. Sep. 28, 2022) (evidence that disclosure would "subject [individuals] to harassment, potential reprisal, derogatory inferences, and suspicion" was necessary to show foreseeable harm under exemption 7(C)), *aff'd*, No. 22-5271, 2023 U.S. App. LEXIS 31109 (D.C. Cir. Nov. 21, 2023) (per curiam) (summary affirmance). "[B]oilerplate" and "generic" assertions of harm are insufficient. *RCFP*, 3 F.4th at 370.

Here, the only harm DCSA proffers is speculative: disclosure might "invite speculation and draw unwanted public attention." Gov't Br. 9. This "perfunctory, sweeping, and undifferentiated declaration" is not sufficient to establish a foreseeable harm as a matter of law. *Leopold*, 94 F.4th at 39. The Government has not shown, and cannot show, that disclosure of a list of Musk's security clearances is actually likely to subject him to harassment or reprisal of some sort. And, in any event, the "harm" articulated by DCSA ignores reality. Musk has already prompted public scrutiny and speculation to these very topics through his own public statements and actions, so public attention to these matters is hardly unwarranted. *See* Ex. 11; *supra* n.43.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment should be denied, and Plaintiffs' cross-motion for summary judgment should be granted.

Dated: June 27, 2025  
      New York, New York

THE NEW YORK TIMES COMPANY

By: */s/ Dana R. Green*　　　　　　　  
    Dana R. Green  
    Alexandra Settelmayer  
    Timothy Tai  
    The New York Times Company  
    Legal Department  
    620 8th Avenue  
    New York, NY 10018  
    Phone: (212) 556-5290  
    Fax: (212) 556-4634  
    dana.green@nytimes.com  
    alexandra.settelmayer@nytimes.com  
    timothy.tai@nytimes.com

    *Attorneys for Plaintiffs*

## **CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the word count requirements of Local Civil Rule 7.1(c). According to the word count in Microsoft Word, which was used to prepare this brief, the number of words in this document, excluding the caption, any index, table of contents, table of authorities, signature blocks, and this certificate, is 8,658.

Dated: June 27, 2025
New York, New York

/s/ Dana R. Green
Dana R. Green